20-5368 Yassin Muhyiddin Aref and Daniel McGowan, Kifa Jayousi, Appellant v. Merrick B. Garland, Attorney General of the United States, et al. Ms. Miripol for the Appellant, Mr. Sauter for the Appellees. May it please the Court, Rachel Miripol from the Center for Constitutional Rights. Along with my colleagues at the law firm of Weill-Gottschall, I represent Plaintiff Appellant Kifa Jayousi. Mr. Jayousi was sent to a communication management unit in 2008 at a time when the Bureau of Prisons had no written criteria for CMU placement and no method for reviewing prisoners for release from those units. Through his five years in the unit, he was given shifting explanations for why he was there, what he needed to do to get out, and was explicitly told he had no due process rights. He seeks a ruling that those shifting and inconsistent procedures do not satisfy Hewitt v. Helms' minimal requirements of notice of the basis for designation, an opportunity to rebut that basis, and periodic review. I'll begin with notice. The District Court erred for two reasons. The District Court ruled that providing a summary of some, but not all... Before you get to the substance, can you just explain to me what is the redressable... How do you have redressability in this case? Right? Because it's your obligation to show that there is Article III case or controversy throughout the pendency of a case. And so I'm wondering why his suit is not moot at this stage. Thank you, Judge Rao. Since the pleading stage, Mr. Jayussi has been seeking expungement of the erroneous and inflammatory information about him that was created through the Counterterrorism Unit's flawed CMU designation and review procedures. So a request for expungement saves a case from mootness, so long as there is a real risk, a more than speculative chance, that that information may harm the plaintiff in the future. What is the harm here? Here, the potential for harm is that the Counterterrorism Unit was designed to monitor individuals like Mr. Jayussi and to share information about them with law enforcement. So as the District Court held, we already know that the FBI visited Mr. Jayussi after his release from the CMU, asking him questions about his time at the CMU and his current life. We know that the information that the Counterterrorism Unit holds about Mr. Jayussi goes far beyond what the basis of his convictions. For example, Mr. Jayussi was not found at trial to have used religious training to recruit anyone towards his conspiracy. He was not found at trial to have communicated directly with al-Qaeda. And yet, because the CMU designation procedures are so flawed, that information is in- What do you mean it was not found at trial? I mean, in a criminal case, there aren't like special verdicts where, you know, facts about going beyond kind of like the elements are found. It's just a question of whether there was evidence that was introduced during the trial that could lead, you know, someone to so conclude, right? Well, that's true, Your Honor. Now, the Counterterrorism Unit states that this information, which appears on Mr. Jayussi's notice of transfer, comes from his pre-sentence report. But we have the pre-sentence report, and it does not say that about Mr. Jayussi in his pre-sentence report. It does say that about a co-defendant of his. And actually, there's been a pattern at the Counterterrorism Unit of including reasons about individuals who are being considered for designation that, you know, that replicate what has been said about their co-defendants and not them. So, you know, here, Mr. Jayussi's notice of transfer says that he was sent to the CMU based on his crime of conviction and his offense conduct. And it describes his offense conduct as involving providing support to Mujahideen, using religious training to recruit others towards a conspiracy, and communicating with Al Qaeda. Now, when Mr. Jayussi used the Administrative Remedy Program, which is the only way individuals sent to a CMU may challenge their designation, he used that program to say, you know, this is not part of my conviction. I was never shown to have done this. And the warden who reviewed his notice, who reviewed his Administrative Remedy at the first level, ignored that factual rebuttal, instead saying that Mr. Jayussi's connection to terrorism was shown through his terrorism enhancement. And that he was also sent to the Communication Management Unit based on sensitive law enforcement information, even though nothing like that appeared in Mr. Jayussi's notice of transfer. So didn't the PSR discuss his involvement with Al Qaeda at paragraph 11 and paragraph 59? My recollection of the PSR, and I'll look at the paragraph you're citing to in a moment, Your Honor, is that there's no direct communication with Al Qaeda. There was information in the PSR about groups that Mr. Jayussi communicated with, who themselves communicated with Al Qaeda, but no communication between Mr. Jayussi and Al Qaeda itself. You said paragraphs 12 and 13, Your Honor? I said paragraphs 11 and 59. Oh, I'm sorry. So you can maybe respond in your rebuttal on that. But I guess, even if for the sake of the standing and redressability, we have to kind of assume you would prevail on the merits, if we get to the merits, what I'm trying to you had notice, because the report from the CTU chief did not say that Mr. Jayussi had been disciplined under the disciplinary kind of system for leading the Muslim prayer. It explicitly said that he had no disciplinary record that he had been sanctioned for, but it just described the prayer and said that they believed that that was concerning. So I'm trying to understand what would have been different had he had noticed that he would have responded to and said, well, this is false. And where was that argued in your brief? Well, two responses, Your Honor. First, on the question of the Jumu'ah prayer service that he led. That really went to the Counterterrorism Unit's reasons for declining to transfer Mr. Jayussi out of the CMU after he had already been there for a period of three years. And our primary argument with respect to the inadequacy of the CMU's review process is that they were untimely. Mr. Jayussi was not reviewed for the first 18 months that he was in a CMU. Bureau of Prisons didn't even have a review process for that period of time. And that once he was reviewed for potential release from the CMU, he was not told what he needed to do to change his behavior. And that gets at Your Honor's question. What would have been different if he had learned that his Jumu'ah prayer service played a role? Well, there were inaccuracies in the way that the Counterterrorism Unit was describing that service. For example, the Counterterrorism Unit said that it was an example of radicalization and that his unit team had recommended against his release from the CMU because he was involved in radicalizing other prisoners. This isn't correct. His unit team had recommended initially against his release from the unit because of his crimes of conviction. By the time his potential release from the unit was up before the Counterterrorism Unit at the three-year mark, they recommended for his release from the CMU, noting his good conduct and his good rapport with staff. So had he had notice of the reasons, he could have explained that the Counterterrorism Unit did not have a full picture of his conduct in the CMU. But moving back, Your Honor, to what he was initially told about his CMU placement, he was told that the reasons for his CMU placement included these aspects of his offense conduct that he felt were contradicted by his pre-sentence report. When he pointed out the errors, he received ever-shifting explanations for why he was in the unit. There wasn't a defense by someone in the Bureau of Prisons saying, no, we looked at your PSR and this is correct, or, well, it doesn't really matter whether that was your offense conduct or not because you're eligible by virtue of your crime of conviction. Instead, he was told by the warden, sensitive law enforcement information is the reason you're there. Then when he appealed to the regional director, he was given yet another description of what led to his CMU placement. Really, I think the problem here is that there is no way to tell for the record why the decision maker actually sent Mr. Jaiussi to the CMU because the decision maker did not write down his reasons for Mr. Jaiussi's CMU placement anywhere. Now, due process requires that an individual have the opportunity to learn the decision maker's reasons. When asked at his deposition why Mr. Jaiussi was sent to the CMU, the regional director said, it would have been based on all the information that I got from the counterterrorism unit. It was probably his offense conduct. That is at, I want to make sure I give you the record site for that, that is at JA1638. So it's clear the regional director had no individual specific knowledge of why he sent Mr. Jaiussi to the CMU. So Mr. Jaiussi's opportunities to rebut those reasons were meaningless. He was left stumbling towards a moving target. I see I'm out of time. Unless your honors have any more questions? Judge Rao, Judge Randolph? No. All right, we'll give you some time on rebuttal. Thank you. All right, we'll hear from counsel for the government. Thank you, your honor. Kevin Soter from the Department of Justice for the government. I'd like to begin on mootness and explain why sort of what's important to keep in mind is that at all previous stages of this case, including the prior appeal to this court, the injury was an injury to liberty. And that injury is indisputably gone from this case. And now all we're left with, as some of the questions we're getting at, is figuring out whether there is any injury that can still be traced to the records that BOP has maintained. And there simply isn't. Everything that is being relied upon by the plaintiff here is too speculative to support the exercise of Article III jurisdiction. And that's made clear when you look at the fact-specific inquiry at what these specific records actually reflect and how they might be used in the future, according to the plaintiff. When you try to pair those two together, you end up with just too much speculation layered on top of speculation to support jurisdiction. The CMU records are available to whom? So the plaintiff has requested expungement of a number of records within BOP's possession, including any reference to the fact that he was in the CMU, which appears kind of throughout. My question is the records themselves, the documents, are they available to the men on the street? Are they available to state law enforcement? Are they available to the FBI? So the BOP has a detailed set of processes related to when it can share records with other law enforcement agencies and with probation offices in particular, which are relevant here. And so the request would have to be made or a process would have to be in place for you to kind of conclude that these records end up shared with anyone. And here, plaintiff has only pointed to two ways in which he expects that these records might be used. One is by law enforcement. And for that, there is just no basis to conclude that any records have been provided that would be detrimental to him or will be provided in the future. And the other is the supervised release court, which we know there's a BOP policy about what gets shared with the probation office in the supervising district. And that policy lays out the documents that would be sent. And those wouldn't include, just sort of as a matter of usual course, they wouldn't include things like the notice of transfer that he's alleging mis-summarized his offense and wouldn't include the internal memoranda summarizing why he was kept in the CMU. And of course, I think it's also important to keep in mind that there's an additional layer of speculation about someone even relying on this information, given kind of factual disputes about the accuracy of it. The due process claim here is primarily, as plaintiff's counsel was discussing, about an adequate opportunity to respond to statements that were made as part of the basis for maintaining the plaintiff in the CMU. And those statements are not inaccurate. But kind of the remedy for that would be to allow the plaintiff to air those responses in, for example, the supervised release proceeding. Okay, thank you. I was interested in the government's argument in footnote seven about whether this court could even order expungement of the records here. Are you suggesting that expungement is not a remedy that's even available to this court? I mean, we have expunged records in the past as a remedy. So the point we were making there is that there is a specific standard that must be met for expungement to actually be an appropriate exercise of a court's equitable discretion. And here we think we are far away from a situation in which that standard is met, in part because of the disconnect between the due process claim and the records here that we're talking about. This isn't a situation like the court's prior cases in Doe, for example, where the allegation was that the government shouldn't have the records at all. And that was an unconstitutional search claim. And so that's a further reason why it's speculative to think that expungement would end up even helping the plaintiff is that it doesn't really redress a due process violation. And Mr. Sutter, could you tell me also, you know, so now there are new procedures for placing someone as being designated for the CMU unit. So how did those procedures differ from the ones that Mr. JUC was subjected to? So in the main, the procedures have not changed. They've been codified at a regulation that states kind of the core requirements that are necessary for due process that have been satisfied here are notice and an opportunity to respond. And they also provide for the additional protection of periodic review at six-month intervals. Those have been main difference, the periodic review. The periodic review has been in place at least since 2009. There's a policy that's in the record. It's a memo from the assistant director for the Correctional Programs Division. And that's at page 975 of the record. So that's been in place since well before the regulation was finalized. Of course, that came into effect shortly after Mr. JUC had been in the unit. So his initial period of his confinement didn't include the specific policy requiring explicit re-examination by the BOP at six-month intervals. But other than that, the policies have been the same since 2009 and since before that for the notice and opportunity to respond. And I think on the merits, it's important to keep in mind just what the due process clause requires. As this court's previous decision recognized, the degree of process due here is minimal and needs to account for the interests of prison administrators making difficult judgments predicting who in the prison population is most in need of these additional communications restrictions to ensure that other communications restrictions that might be in place in other units can't be circumvented. And here, the processes that are in place amply satisfy that requirement. To address some of the points that were made previously, I think it's important to see how far away this case actually is from shifting explanations or something where you are unable to respond. If you look at the notice that was given to the plaintiff here, the objection that he made and the response that he received in the record, those show no reasonable dispute that he was placed in this unit because of his convictions, because his offense conduct included communicating in code. You can see that in the PSR at the paragraphs that were being discussed. You can also see kind of the connections to al-Qaeda at the paragraphs that Judge Wilkins was pointing to, as well as I would point to the 11th Circuit's decision in the direct appeal at page 1105 goes through some of the offense conduct that's relevant there. And it mentions, I think it's also, you can look at the PSR, I think it was paragraph, sorry, I believe paragraph 59 maybe mentions communications received from foreign terrorist organizations. I'm happy to address any questions the court has about either mootness or the merits. Judge Rao, Judge Randolph? No, I don't have any. Yes. All right. Thank you. We'll hear from counsel for a panel on rebuttal. Give counsel two minutes. Thank you. First, to answer your question, Judge Wilkins, I reviewed paragraphs 11 and 59. Paragraph 11 does talk about al-Qaeda, but not any connection Mr. Jayousi specifically had to al-Qaeda. And paragraph 59 is a connection to someone with a connection, not a direct connection himself. And there again is nothing in the PSR that speaks of Mr. Jayousi using religious training to recruit anyone toward a conspiracy. Moving to the question of whether the injury in this case is too speculative. There is no difference between this case and Abdel Fattah, which the district court relied on, except that Mr. Jayousi has provided more information about how the evidence, the allegations about him could harm him in the future. And it's not surprising that in Abdel Fattah, this court didn't require specific evidence of how the information could be used against that plaintiff. Because it's sort of common sense that when a government agency, especially an agency designed to share information, has negative information about you, that creates a risk of harm. Indeed, in Hedgepath, then Judge, now Chief Justice John Roberts used this common sense approach when considering that a child plaintiff's request for expungement of her arrest record saved her case from mootness, given that the child would not have to face the possibility in the distant future of answering questions on an employment form about whether she had an arrest record. Now, the child had no pending applications for employment that I'm aware of, nor did she testify that she wanted to work in a field where these kind of questions were answered. Rather, it was a common sense approach about a real risk of harm. Judge Randolph asked about whether the documents are available to the FBI. And I find it notable here that throughout this case, the Bureau of Prisons has never taken the step of getting a declaration from the Counterterrorism Unit disavowing their intent to share this information with the FBI in the past or in the future, when it would have been quite easy for them to do so. And finally, the new procedures that are at issue in this case, which Judge Rao asked about, notably, the Administrative Remedy Program remains the only way that individuals in the CMU can rebut the factual basis for their placement, though not a single individual has ever used that program successfully. Thank you, Your Honors, unless there are any other questions. All right. Thank you. We'll take the matter under advisement.
judges: Wilkins, Rao, Randolph